IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Enviro Tech International, Inc.<br>2525 West LeMoyne Avenue<br>Melrose Park, Illinois 60160,<br><br>      Plaintiff,<br><br>vs.<br><br>Stephen L. Johnson, Administrator, Environmental Protection Agency<br>Ariel Rios Building<br>1200 Pennsylvania Avenue, N.W.<br>Washington, DC 20460<br><br>      Defendant. | CASE NO. |

## COMPLAINT

1. This suit is to compel Environmental Protection Agency ("EPA") Administrator Stephen L. Johnson to carry out his nondiscretionary statutory duty under § 612(d) of the Federal Clean Air Act ("CAA"), 42 U.S.C. § 7671k(d), to issue a final order either granting or denying the long-pending administrative petitions to list n-propyl bromide ("nPB") as an acceptable substitute for ozone-depleting substances ("ODS") used in the solvent cleaning sector and in aerosol solvents and adhesives. Plaintiff Enviro Tech International, Inc. ("ETI") has petitioned the U.S. Court of Appeals of the District of Columbia to review EPA's actions concerning nPB. However, EPA has filed a motion to dismiss that action, arguing that the Court of Appeals lacks jurisdiction under CAA § 307(b)(1) and that the relief ETI seeks must be brought in this Court under CAA § 304(a). While ETI disagrees with EPA's position, it is filing this complaint to protect its interests.

## JURISDICTION

2. This action arises under the Clean Air Act, 42 U.S.C. § 7401 et seq. (the "CAA"). This Court has jurisdiction over this action pursuant to CAA section 304(a)(2), 42 U.S.C. § 7604(a)(2), as well as 28 U.S.C. §§ 1331 and 1361, and may issue a declaratory judgment and grant further relief pursuant to 42 U S C § 7604(a) and 28 U.S.C. §§ 201 and 2202. ETI has a right to bring this action pursuant to 42 U S C § 7604(a)(2) and the Administrative Procedure Act, 5 U.S.C. §§ 701 to 706.

3. By letter dated August 15, 02006, Plaintiff ETI gave notice to Defendant Johnson, pursuant to 42 U.S.C. § 7604(b)(2), of the violations alleged herein.

## PARTIES

4. Plaintiff ETI is a corporation organized under the laws of the State of Illinois. nPB is the main constituent in ETI's degreasing and cleaning solvent that it markets under the trade name EnSolv. In January 1996, ETI petitioned EPA to add nPB to the list of acceptable substitutes for ozone depleting substances under EPA's Significant New Alternatives Policy ("SNAP") program. Despite notifying ETI in September 1997 that EPA had determined that nPB should be included on the SNAP list of acceptable substitutes, EPA took no action to actually place nPB on the acceptable substitutes list. Six years later, in June 2003, EPA issued a proposed rule to list nPB as an acceptable substitute. Although EPA has no statutory authority under the CAA to set workplace exposure limits, EPA included in the proposed rule an acceptable exposure limit for nPB of 25 ppm. Over three years have elapsed and EPA has still not finalized the rule.

5. By proposing to list nPB as an acceptable substitute with a recommended AEL of 25 ppm and withholding a final decision on the proposal, EPA has deprived ETI of its statutory

right to judicial review on two questions: (1) whether, as a matter of law, EPA has exceeded its statutory authority in setting a workplace exposure limit for nPB under the SNAP program and (2) if EPA has such authority, whether EPA was arbitrary and capricious in setting a 25 ppm AEL. By allowing the proposal to linger, EPA has created (1) uncertainty regarding whether nPB is an acceptable substitute for ozone-depleting substances under the SNAP program and (2) a *de facto* AEL for nPB that effectively usurps other federal agency roles and is not scientifically justified. EPA's failure to act has directly harmed ETI by calling into question the safety of its products, thereby causing ETI to lose existing and potential customers. EPA has also impeded ETI's efforts to expand its business, including nPB products that are used in industries for which SNAP listing is not necessary. Assuming the Court of Appeals lacks jurisdiction to hear ETI's claims, the only judicial recourse available to ETI is this action to compel EPA to take final action on the petitions, as required by CAA § 612, in accordance with a Court-ordered schedule so that a final order is issued and ETI can obtain judicial review before the Court of Appeals on the merits of EPA's action.

6. Defendant Stephen L. Johnson is sued in his official capacity as the Administrator of the Environmental Protection Agency, with his principal place of business located at Ariel Rios Building, 1200 Pennsylvania Avenue, N.W., Washington, DC 20460. As Administrator, Defendant Johnson has the ultimate responsibility for the activities of the EPA, including those actions complained of herein.

## STATEMENT OF FACTS

### General Overview

7. The stratospheric ozone layer protects the earth from ultraviolet-B (UV-B) radiation, which has been linked to higher incidences of skin cancers, cataracts, suppression of the immune system, and damage to crops and aquatic organisms. In response to concerns over

ozone depletion, in 1987 the United States and 23 other nations signed the Montreal Protocol on Substances that Deplete the Ozone Layer (the "Montreal Protocol"). The Montreal Protocol set a timetable for reducing the production and consumption of specific ozone-depleting substances, including certain chlorofluorocarbons ("CFCs") and halons. In 1990, the parties to the Protocol agreed to expedite the CFC phase-out and to add phase-out requirements for other ozone-depleting substances.

8. In 1990, Congress also added Title VI, "Stratospheric Ozone Protection," to the CAA. CFCs are "Class I" ozone-depleting substances (halons, carbon tetrachloride, and methyl chloroform) and hydrochlorofluorocarbons ("HCFC") are "Class II" substances. Sections 604 and 605 set forth phase-out schedules for Class I and Class II substances consistent with the Montreal Protocol. Title VI also seeks to reduce emissions of Class I and II substances to the "lowest achievable level" in the refrigeration sector and to maximize the use of recycling and recovery upon disposal (§ 608). Title VI requires EPA to ban certain nonessential products containing ozone-depleting substances (§ 610); establish standards and requirements for the servicing of motor vehicle air conditioners (§ 609); mandate warning labels on products made with or containing Class I or containing Class II substances (§ 611); and establish a safe alternatives program (§ 612).

**CAA Section 612**

9. In Section 612(a), Congress mandated that "to the maximum extent practicable, class I and II substances shall be replaced by chemicals, product substitutes, or alternative manufacturing processes that reduce overall risks to human health and the environment." 42 U.S.C. § 7671k(a). In section 612(c), Congress directed EPA to promulgate rules making it "unlawful to replace any class I or class II substance with any substitute that the Administrator determines may present adverse effects to human health or the environment, where the

4

Administrator has identified an alternative that (1) reduces the overall risk to human health and the environment, and (2) is currently or potentially available." *Id.* § 7671k(c). EPA is required to publish a list of substitutes acceptable for specific uses, as well as a list of unacceptable alternatives for specific uses. *Id.* Section 612(d) grants any person the right to petition EPA to add a substance to or delete a substance from the lists published in accordance with section 612(c). *Id.* § 7671k(d). EPA must grant or deny a petition within 90 days. *Id.* Section 612(e) directs EPA to require any person who produces a chemical substitute for a class I substance to notify the Agency not less than 90 days before new or existing chemicals are introduced into interstate commerce as substitutes for class I substances. *Id.* § 7671k(e). The producer must also provide the Agency with the producer's health and safety studies on such substitute. *Id.* Finally, section 612(b) requires EPA to maximize the use of federal resources to assist users of class I and II substances to identify and develop alternatives, and to create a public clearinghouse of alternative chemicals, product substitutes, and alternative manufacturing processes that are available for products and manufacturing processes which use class I and II substances. *Id.* § 7671k(b).

**The SNAP Program**

10.    In March 1994, EPA finalized its regulations for the § 612 program, which EPA titled the Significant New Alternatives Policy ("SNAP") program. 59 Fed. Reg. 13044 (March 18, 1994) (codified at 40 C.F.R. Part 82, Subpart G). Under the regulations, EPA evaluates the acceptability or unacceptability of substitutes with regard to the specific end-uses of those substitutes in eight industrial sectors: refrigeration and air conditioning, foam-blowing, fire suppression and explosion protection, solvents cleaning, sterilants, aerosols, tobacco expansion, and adhesives, coatings, and inks. 42 C.F.R. § 82.172. A substitute may be approved for use in one category, but not for use in others.

5

11. In accordance with CAA § 612(d), EPA regulations provide that "any person may petition the Agency to amend existing listing decisions under the SNAP program, or to add a new substance to any of the SNAP lists," including "petitions to add a substance not previously reviewed under the SNAP program to the acceptable list." *Id.* § 82.184. EPA requires that petitioners submitting a petition to add a substance to the acceptable list provide information concerning the substitute's end uses, its manufacturing process, the substitute's ozone depletion potential, its global warming impacts, and health and safety studies on the effects of the substitute. *Id.* § 82.184 (c). Upon receipt of a petition, EPA will notify the petitioner within 15 days if any additional data are needed. 59 Fed. Reg. 13061. If no action is taken within the 15-day period, the petition is deemed complete, and EPA must respond to a petition within 90 days. *Id.* §82.184 (d)(4). The regulations provide that EPA may ask for additional information during the 90-day review period, and that if EPA has not acted on the petition at the conclusion of 90 days, the manufacturer may introduce the substitute into interstate commerce. *Id.* §82.180(A)(8). EPA initiates a rulemaking whenever it grants a petition to add a substance to the list of unacceptable substitutes, remove a substance from any list, or change or create an acceptable listing by imposing or deleting use conditions or limits. *Id.* §82.184(d)(5).

12. EPA's criteria for determining whether a substitute is acceptable as a replacement for Class I or II compounds include the atmospheric effects and the related health and environmental impacts associated with the substitute, the general population risks from ambient exposure to compounds with direct toxicity, ecosystems risks, occupational risks, consumer risks, flammability, and cost and availability of the substitute. *Id.* §82.180(a)(7). Based on these criteria, EPA may find the substitute acceptable, acceptable subject to "use conditions," acceptable subject to "narrowed use limits," unacceptable, and "pending." *Id.* §82.180(a)(8).

13.     In the SNAP rule, EPA claims that it has the authority to assess the occupational risks associated with a substitute, and to condition approval of a substitute on compliance with workplace standards for occupational safety. EPA claimed that it has the authority to fill any existing "regulatory gap" by developing its own occupational standards for worker health and safety inside the workplace. 59 Fed. Reg. 13051. EPA further stated that it would replace its occupational health and safety standards with OSHA standards if, and when, OSHA developed applicable standards. *Id.*

**n Propyl Bromide**

14.     nPB is a colorless to light yellow liquid that is used as a component in cleaning solvents. Since 1996, nPB has been used extensively as a vapor degreasing solvent for precision degreasing of high-tech electronic components in the aerospace, military, electronics, and optical industries. nPB is one of a limited number of affordable solvents that performs well in these industries. It is also used as a carrier in adhesives and inks (as a diluent for the application of adhesives, paint, and polymer coatings), and as a pharmaceutical intermediary in the production of ibuprofen, aspirin, and other drugs. The use of nPB in the United States is relatively small compared to other chlorinated solvents, with approximately 7 to 8 million pounds used each year.

15.     Since EPA phased-out 1,1,1 Trichloroethane ("TCA") and HCFC-141b ("141b") in accordance with the Montreal Protocol, nPB is the only viable new alternative solvent developed for vapor decreasing, ultrasonic cleaning, and carrier applications that is economically feasible for businesses to use. nPB is a non-flammable liquid that has a short atmospheric life (11-20 days), and a very low ozone-depleting potential over the U.S. (0.013). It does not contribute to global warming. Moreover, unlike chlorinated solvents (trichloroethylene ("TCE"), perchloroethylene ("PERC"), and methyl chloride), nPB is not expected to be carcinogenic.

**Petitions to List nPB as an Acceptable Substitute**

16. *Over eleven years ago*, on June 13, 1995, Albemarle Corporation ("Albemarle") petitioned EPA to add nPB to the list of acceptable substitutes for ozone-depleting substances in the solvent cleaning sector. On January 30, 1996, EPA received ETI's similar petition for its nPB product (EnSolv), also for use in the solvent cleaning sector. EPA did not request additional data from either Albemarle or ETI within 15 days of receiving the petitions. In accordance with the regulations, ETI's petition was deemed complete on February 14, 1996, and EPA's 90-day statutory review period expired on May 14, 1996.

17. Both Albemarle and ETI submitted to EPA extensive data in support of their petitions. Nevertheless, after the 90-day review period expired, EPA asked ETI to conduct an ozone depletion study on nPB, and asked Albemarle to conduct additional toxicity studies, including 28-day and 90-day animal inhalation studies. This data was provided to EPA by early 1997.

18. On September 11, 1997, EPA sent a letter to Albemarle stating that "EPA has made a determination that it [nPB] should be included on the list of acceptable alternatives" for use in the solvent cleaning, adhesives, and coatings and inks sectors subject to use conditions. EPA further stated that the proposed listing would be made in the next notice of proposed rulemaking for the SNAP program.

19. On September 16, 1997, EPA sent a similar letter to ETI.

20. It was a mistake for EPA to announce that nPB was approved for use in the adhesives and coatings and inks sectors, because neither Albemarle nor ETI had requested SNAP approval for use of nPB in these sectors.

21. *Two and one half years* after Albemarle submitted its petition, and *two years* after ETI's petition was submitted, on February 24, 1998, EPA published a correction in the Federal

8

Register stating that review of the Albemarle petition (document number VI-D-114) disclosed that a submission for the aerosol, adhesives, and coatings and inks sectors had yet to be received. EPA further stated that "[a]s such, all distribution and sale into th[ese] area[s] must cease until a complete submission is obtained and the necessary review period has elapsed." 63 Fed. Reg. 9151 (Feb. 24, 1998). EPA did not in any way retract its notice of acceptability for use of nPB in the solvent cleaning sector. Nor did EPA order that sales of nPB to the solvent cleaning sector cease. In April 1998, Albemarle submitted a second petition for listing nPB as an acceptable substitute for ozone-depleting substances in the aerosol, adhesives, and coatings and inks sectors.

**EPA's Disparate Treatment of nPB**

22. *Despite notifying ETI in September 1997 that nPB was an acceptable substitute for ozone-depleting substances in the* cleaning *solvent sector, EPA has yet to add nPB to the list of acceptable substitutes as it is required to do under CAA § 612.* Instead, for years EPA has impermissibly focused on deriving a workplace exposure limit for nPB. No other organic chemical that EPA has considered to date under the SNAP program has received the level of scrutiny nPB has received with regard to workplace exposures. Of 69 single organic chemicals that EPA has considered, in 34 cases EPA has deferred to OSHA permissible exposure limits ("PEL") or voluntary standard setting organizations that establish acceptable exposure limits ("AELs") in occupational settings; EPA has calculated but not published, AELs in 21 cases; and EPA has adopted the manufacture's recommended exposure limits in 13 cases. EPA has spent years focusing on workplace exposures for only one chemical – nPB.

23. *Three years* after ETI submitted its petition, EPA published an advanced notice of proposed rulemaking ("ANPR") to collect additional data on nPB. The ANPR specifically sought toxicity data to support EPA's calculation of a workplace AEL for nPB. 64 Fed. Reg. 8043 (Feb. 18, 1999). The comment period for the ANPR closed in April 1999. nPB remained

9

in regulatory limbo for *four more years* until June 2003, when EPA published a proposed rule to list nPB as an acceptable substitute, subject to use conditions (1) for CFC-113 and TCA in metals, precision, and electronics cleaning, and (2) for CFC-113, TCA, and HCFC-131b in adhesives and aerosol solvent end uses. 68 Fed. Reg. 33284 (June 3, 2003). The use conditions EPA proposed for each end use were that nPB contain not more than 0.05 percent isopropyl bromide by weight before adding stabilizers or other chemicals. The public comment period on the proposed rule closed on August 4, 2003. At that time, EPA indicated that it expected to finalize the rule in 2004.

24. Yet *more than three more years* have passed since the proposal was published and EPA has not acted to list nPB as an acceptable substitute under CAA § 612. In fact, in the last three years EPA has not taken any action that would advance its final decision on nPB. Rather, it appears that EPA intends to issue yet another notice of proposed rulemaking for nPB. *ETI has now waited **almost eleven years*** for a final agency decision!

**EPA's Impermissible Derivation of a Workplace Exposure Limit for nPB**

25. EPA has unreasonably delayed proposing and finalizing a rule to add nPB to the list of acceptable substitutes because its principal focus has been on establishing a workplace AEL for nPB. In 1998, EPA indicated that it planned to list nPB with a "use" condition that consisted on an occupational AEL of 50 parts per million ("ppm"). In 2002, EPA reaffirmed that its review of nPB involved occupational exposure limits but stated that it only intended on making a "comment" regarding a recommended workplace AEL for nPB. In May 2002, EPA published a "draft final report" that was prepared by its contractor (ICF Consulting) that recommended an AEL of 25 ppm for nPB. Yet ICF had previously recommended an AEL of 100 ppm, which is the industry's recommended AEL for nPB and the accepted benchmark for industrial solvents.

10

26. Indeed, SNAP-approved compounds in use in the precision cleaning sector and their associated OSHA PELs or EPA-approved manufacturers' workplace exposure limits ("WEL") include TCE (OSHA PEL - 100 ppm), PERC (OSHA PEL - 100 ppm), 1,2, trans-dichloroethylene (OSHA PEL - 200 ppm), HCFC-225 (WEL - 100 ppm), HFE 7100 (WEL - 750 ppm), HCFC-4310-mee (WEL - 200 ppm), and HFE 7200 (WEL - 200 ppm). Only methylene chloride has an OSHA PEL below 100 ppm (at 25 ppm), due to concerns about carcinogenicity. These concerns do not exist for nPB.

27. In the marketplace, an EPA-recommended AEL is viewed as the level of risk associated with a solvent: the lower the AEL, the greater the perceived risk. Thus, a 25 ppm AEL for nPB is perceived as meaning that nPB is four times more dangerous than other industrial solvents that have AELs of 100 ppm. However, the science shows that nPB is far safer to use than many of these industrial solvents.

28. In its proposed rule to list nPB as an acceptable substitute, EPA recommended an AEL of 25 ppm for nPB. In doing so, EPA adopted an AEL that was derived using a methodology that neither EPA or OSHA, nor any voluntary standard-setting organizations, have ever used to derive AELs. EPA has no authority to set workplace standards. If the issue were properly before OSHA, EPA's recommendation would fail because EPA's proposed AEL improperly relies on only one animal study, ignores data from all other animal studies, does not consider human data, and applies uncertainty factors not used for workplace exposures, all of which deviates from accepted risk assessment methodology. Moreover, before proposing the rule, EPA rejected all reasonable approaches for deriving an AEL presented to it by ETI and other nPB manufacturers.

11

**ETI's Efforts To Persuade EPA to Act**

29.     In the *seven and one half years* prior to EPA publishing its proposal to list nPB as an acceptable substitute, ETI met with EPA on numerous occasions, called EPA countless times, and wrote numerous letters urging EPA, without success, to take action. Out of frustration, in June 2002, ETI and the International Brominated Solvent Association ("IBSA") solicited the help of the EPA Inspector General's National Ombudsman, and in February 2003, sought the help of the Office of Management and Budget, Office of Information and Regulatory Affairs ("OIRA"). Finally, in June 2003, EPA proposed a rule listing nPB as an acceptable substitute.

30.     In the *three years* since EPA published its proposed its rule to list nPB as an acceptable substitute, EPA has done nothing to finalize the rule. There have been no new studies on nPB that would change EPA's findings in the proposed rule regarding the flammability of nPB, its low ozone-depleting potential, and its low global warming potential. Nor have there been any new toxicity studies that show that nPB is carcinogenic or may cause health or environmental effects that were not already considered by EPA.

31.     Indeed, until last week, the last entry in EPA's docket for the proposed rule (OAR-2002-0064) was in 2004. Curiously, beginning on November 2, 2006, EPA submitted a barrage of documents to the docket, most likely in response to ETI's petition pending before the Court of Appeals (docketed on August 15, 2006) and ETI's Freedom of Information Act request that was sent to EPA on October 23, 2006. ETI's FOIA request specifically requested copies of all documents that EPA has reviewed in connection with nPB since the June 2003 proposed rule was published in the Federal Register. It is only in response to external pressure that EPA addresses nPB at all.

32.     EPA would like ETI and others (including the Court of Appeals and this Court) to believe that it is making progress in its regulatory review of nPB. It has signaled that it intends

12

to publish a supplemental notice of proposed rulemaking to list nPB has an acceptable substitute. There is no date certain by which this supplemental proposal is to be made available to the public, nor is there any date certain by which the proposal would be finalized. Given EPA's long history of delaying final action on nPB, unless the Court intervenes and compels EPA to act, it will be years before a final rule is published and nPB is added to the list of acceptable substitutes for ozone depleting substances. EPA's eleven-year foot-dragging on nPB is egregious and must come to an end. EPA cannot continue to evade judicial review by continuing to engage in never ending regulatory review.

## CLAIM FOR RELIEF

33. Plaintiff incorporates by reference all allegations contained in paragraphs 1 through 31.

34. Defendant Johnson's failure to take final action on ETI's petition to add nPB to the list of acceptable substitutes as it is required to do under CAA § 612 constitutes a "failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator" within the meaning of Clean Air Act § 304(a)(2), 42 U S C § 7604(a)(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff ETI respectfully prays that this Court:

(1)  Declare that defendant Johnson's failure to take final action on ETI's petition to add nPB to the list of acceptable substitutes as it is required to do under CAA § 612 constitutes a "failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator" within the meaning of Clean Air Act § 304(a)(2), 42 U S C § 7604(a)(2);

(2)  Order defendant Johnson to finalize EPA's proposed rule to add nPB to the list of acceptable substitutes as it is required to do under CAA § 612 in accordance with expeditious deadlines specified by the Court;

(3)  Retain jurisdiction of this action to ensure compliance with its decree;

(4)  Award plaintiff the costs of this action, including attorney's fees; and

(5)  Grant such other relief as the Court deems just and proper.

Respectfully submitted,

Geraldine E. Edens (Bar. No. 437056)

MCKENNA LONG & ALDRIDGE LLP
1900 K Street, NW
Washington, D.C.  20006
(202) 496-7500

This 7th day of November, 2006

Attorney for Plaintiff
Enviro Tech International, Inc.

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I (a) PLAINTIFFS
ENVIRO TECH INTERNATIONAL, INC.

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Cook County, IL
(EXCEPT IN U.S. PLAINTIFF CASES)

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Geraldine Edens, Esq.
McKenna Long & Aldridge
1900 K St. NW
Washington, DC 20006
202-496-7371

## DEFENDANTS
STEPHEN L. JOHNSON, ADMINISTRATOR, ENVIRONMENTAL PROTECTION AGENCY

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  Washington, DC
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

CASE NUMBER  1:06CV01905

JUDGE: Emmet G. Sullivan

DECK TYPE: Administrative Agency Review

DATE STAMP: 11/07/2006

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- 1 U.S. Government Plaintiff
- 3 Federal Question (U.S. Government Not a Party)
- 2 U.S. Government Defendant
- 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP FOR PLAINTIFF

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | 1 | 1 | Incorporated or Principal Place of Business in This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated and Principal Place of Business in Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

### A. Antitrust
☐ 410 Antitrust

### B. Personal Injury/Malpractice
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

### ⊙ C. Administrative Agency Review
☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☒ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

### D. Temporary Restraining Order/Preliminary Injunction
Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

### E. General Civil (Other)   OR   F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

3

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |
| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**
- ⊙ 1 Original Proceeding
- ○ 2 Removed from State Court
- ○ 3 Remanded from Appellate Court
- ○ 4 Reinstated or Reopened
- ○ 5 Transferred from another district (specify)
- ○ 6 Multi district Litigation
- ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
Action to compel agency action under section 304(a) or the Clean Air Act.    42 U.S. 7401

**VII. REQUESTED IN COMPLAINT**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ _____   Check YES only if demanded in complaint
JURY DEMAND:    YES ☐    NO ☒

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☒    NO ☐    If yes, please complete related case form.

DATE  11-07-2006    SIGNATURE OF ATTORNEY OF RECORD  [signature]

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.